No. 78.—GEORGE REESE, plaintiff in error, *vs.* JUSTICE WYMAN and others, defendants in error.

[1.] Chancery will exercise the power of reforming a written contract sparingly and with great caution, and only upon the clearest proof of the intention of the parties, and of the accident or mistake upon which the jurisdiction is invoked.

[2.] Chancery will reform a written contract, upon proof that the writing does not exhibit the contract as it was agreed upon by the parties at the time, and that the parts omitted were omitted by accident, mistake, inadvertence or fraud.

[3.] If one in treaty with another for the sale of property, misrepresents a material fact, stating it to be true, when at the time he knows it to be false, and the other party trusts to the statement and acts upon it, it is a positive fraud, for which Equity will rescind the contract.

[4.] Such a fraud may be perpetrated by acts as well as by words, and by any artifices designed to mislead.

[5.] Whether a party thus misrepresenting a fact, knows it to be false or not, is wholly immaterial.

[6.] When a party thus affirming a fact which is false, believes it to be true, it is not a fraud in fact, but a fraud in Law.

[7.] And if a party innocently, by mistake, misrepresents a fact which is material, and to which the other party trusts, it is cause for rescinding the contract, because it operates as a surprise upon him.

In Equity, in Troup Superior Court. Tried before Judge HILL, November Term, 1850.

This was a bill in Equity, filed by the plaintiff in error against the defendants. The bill alleged, that the defendants, on the 29th of December, 1837, were united and associated as co-partners, under the name and style of the " West Point Company," and as such were the owners of a town, laid off into lots and streets by them, on the Chattahoochee river, in the County of Troup, known and called West Point; that on the 28th of September, 1837, they advertised said lots for sale, stating in the notice, that " It was certain the Montgomery & West Point Railroad would be completed in a short time." The bill alleged, that the defendants were stockholders, and exerted a controling influence in the affairs of said railroad company, and complainant relied, with the utmost confidence, in the representations and assertions of the defendants; that the complainant, knowing that the value of the lots in the said town, depended on the completion of the road, declined to purchase the same, without a distinct understanding as to what should be done in the event said road should not be completed.

The bill alleged, that on the day of sale, John C. Webb, one of the proprietors, and as the agent of the company, in order to induce the purchasers to buy, stated, that the company would, in the event said railroad was not completed to West Point, re-fund the purchasers of said lots the purchase money they were required by the terms of sale to pay, with interest thereon from the time of payment; that on the day of sale, 11th December, 1837, they sold a great many lots, with the understanding as charged. Afterwards, on the 29th day of December, 1837, complainant purchased of John C. Webb, as the agent of the company for that purpose, two lots, at private sale, on the same terms and understanding, as those published and made known on the day of sale, and received the bond of said company for titles, which was printed and prepared the day before the day of sale, and was in the ordinary form. Complainant paid a part of the purchase money for the said lots.

The bill charges that the railroad has not been completed to the town of West Point, and that it never will be; that the charter has been forfeited to the State by the terms thereof, and

the road sold under execution, and become the property of other stockholders, in consequence of which, the said lots had become of no value; that on the 1st day of May, 1844, complainant demanded of the agent of the company, the purchase money paid by him for said lots, and offered to deliver up the bond to be cancelled, which he refused to do.

The bill prays that the contract for said lots may be rescinded, that the defendants refund the purchase money paid, with interest, and deliver up to be cancelled, the notes of complainant held by said company, and that they have their bond held by complainant; also, that the said bond may be reformed, so as to contain the stipulations of the parties as set forth in the bill.

The defendants, by their answer, admit the sale of the lots, on the following terms: one-fourth of the purchase money to be paid on the 1st day of March, 1838, one-fourth 1st March, 1839, and the other half when the first steam car should run from Montgomery, in the State of Alabama, to West Point. They deny that it was stipulated to be completed at any particular time, and allege that the road is now in progress of completion, and will be finished to West Point in a short time.

McGehee, one of the defendants, denies that the "West Point Company" owned a majority of the stock, or had a controlling influence in said railroad company.

On the trial of the cause, it was proved by several witnesses, that on the day of sale, the representations as charged in the bill were made; that it was publicly proclaimed that the said railroad would be completed in a short time; that Webb and McGehee, two of the company, represented that it would be finished by the year 1844, &c. &c.

The Court charged the Jury, "That the contract under consideration was sought to be set aside—

"1st. By reformation and non-performance on the part of defendants with their part; and

"2d. For fraud in procuring the agreement of complainant, by misrepresentation, concealment and fraud, *and the contract thus induced.*

"In order to find in favor of complainant on the first ground,

the Jury must be convinced, *beyond a reasonable controversy*, that by reason of said accident, mistake or inadvertence, the contract was reduced to writing, in form and in substance different from the intention of the parties, as to *facts* or *law*, and that a mistake of fact or legal right, (clearly proven,) might be corrected; but on the second ground, if the Jury believed that plaintiff was induced to make the contract by false or fraudulent misrepresentations, or concealment of truth, whether made honestly or dishonestly, with or without knowledge, intentionally or innocently, (inasmuch as fraud vitiates all contracts,) if the complainant was really imposed upon by any artifice or misplaced confidence, the contract ought to be set aside, and the parties placed in *statu quo*, or as they were, the money refunded, and notes given up according to complainant's prayer; that the Court would leave *special application of rules* to be made to the present case by the Jury. Upon these two points the case turns, *or one of them*. If either found for complainant, his prayer ought to be granted; otherwise, a finding for defendants generally. To reform a contract, there must be no doubt left of what the *real contract* was, and then (as to time, place and circumstances) it must be construed and reformed according to the intentions of the parties. If left doubtful in terms, the Jury should not attempt reformation, but bind the parties by the terms of the writing."

The Jury found for the defendants, and counsel for complainant excepted to the charge of the Court, and his refusal to charge.

W. DOUGHERTY, for plaintiff in error, cited—

*Story's Eq. Jur.* §§162, 192. 1 *Kelly*, 25. *Simpson vs. Vaughn*, 2 *Atk.* 33. 6 *Serg. & R.* 262. *Thomas vs. Frazer*, 3 *Ves.* 399. 2 *Kent*, 486, '87, *note*. *Hunt vs. Rousmanier*, 8 *Wheat.* 174. 3 *Atk.* 386. 11 *Mees. & Wels.* 401. 2 *Wheat.* 178, 195. 6 *Clark & Fin.* 232, 233. 11 *Ala. Rep.* 535, 1058.

O. A. BULL, for defendants in error, relied on—

1 *Story's Eq.* §§152, 157.    *Ib.* 162.    1 *Bro. Ch. R.* 338, 341.    1 *Ves.* 317.    7 *Ib.* 217.    2 *John. Ch. R.* 585.    *Ib.* 630. 2 *Cranch.* 442.    1 *Story's Eq.* §§200, 203.    7 *Johns. Ch. Rep.* 201.    1 *Simons' R.* 63.

*By the Court.*—NISBET, J. delivering the opinion.

Numerous requests to charge were made by the counsel for the plaintiff in error in this case, which the presiding Judge declined to give, and the charge which he did give, and his various refusals to charge as requested, are excepted to. That part of the charge copied into the Reporter's brief, contains what the Court did rule, and covers all the points really made in the case. If the Court was right in this instruction, he was right in not instructing as requested. Our opinion is, that the law applicable to the case, and growing out of it, was correctly given to the Jury, and I do not, therefore, find it necessary to follow the assignment in its numerous specifications. This is a bill to reform a contract, and when so reformed, to have it annulled, and the parties reinstated in their original position, because of non-performance on the part of the defendants. That is to say, the bill charges, that the contract, reduced to writing, is not the contract made between the parties. It sets out what the true contract was, and claims that, according to the true contract, the defendants have not complied with their stipulations, and the prayer is, that it be cancelled, and the amount paid under it by the plaintiff be refunded to him. To understand the true point at issue between the plaintiff in error and the Court below, it will be necessary to refer with greater particularity to the facts. The defendants being owners of the land, laid out the town of West Point, in anticipation of the completion of the railroad from Montgomery, Alabama, to that place, and advertised the lots for sale. The bill charges, that it was stated in the advertisement, that "It was certain that the Montgomery & West Point Railroad would be completed in a short time;" and that the defendants were stockholders in the railroad company, and exerted a controlling influence in the affairs of that company;

that on the day of sale, John C. Webb, one of the proprietors of the West Point lots, and acting as agent for the others, stated, that in the event that the railroad was not completed to West Point, they would refund to the purchasers the amount of the purchase money, which by the terms of the sale they were required to pay, with interest from the time of payment. The terms of sale were, one-fourth of the purchase money to be paid on the 1st of March, 1838, one-fourth on the 1st of March, 1839, and the other half when the first steam car should run through from Montgomery to West Point—notes for the purchase money, and a bond for titles when the whole was paid. The bill also charges, that the railroad has not been completed to West Point, and never will be, for that the charter has been forfeited to the State, and the road sold under execution, and has become the property of other stockholders; that the complainant has paid a part of the purchase money, &c. &c. It avers farther, that the complainant did not buy at the public sale, but bought two of the lots at private sale, eighteen or twenty days thereafter, *upon the terms of the public sale.* It charges that it was agreed and understood, that he was to take the lots upon the same terms and conditions with those who bought at public sale. He executed his notes for the purchase money, and took the defendants' bond for titles, conditioned for titles to be made when the whole of the purchase money was paid. Now, the complainant comes into Equity and asserts that the contract was, in addition to what appears in writing, that if the *railroad* should not be built to *West Point,* they, the defendants, would refund the purchase money, with interest, and asks that it may be reformed in that particular. The defendants plant themselves upon the contract as it appears in writing, and deny that it is a case where Equity will interfere. It is thus manifest how the question is made. The position of the complainant is, that he having purchased upon the terms and conditions of the public sale, and having proven that those terms and conditions were different in the material particular stated, from the contracts as reduced to writing, he is entitled to have his rights adjudicated according to the terms and conditions as proven. The reply of the defend-

ants is, the writing is the highest and best, and, in fact, the controlling evidence of what was the contract at the time it was made, and cannot be varied, unless it appears that, by mistake or fraud, something was omitted in the writing which it was, *at that time,* agreed to be inserted in it.

[1.] The Court, throughout all the various instructions which he was called upon to give, consistently held to this position of the defendants, and we must say, so held in accordance with the law of the case. The Court states the general proposition to the Jury thus—" In order to find for the plaintiff on the first ground, the Jury must be convinced beyond a reasonable controversy that, by reason of accident, mistake or inadvertence, the contract was reduced to writing, in form and in substance different from the intention of the parties as to facts or law, and that a mistake of fact or legal right (clearly proven) might be corrected." The distinction insisted upon, all through the case, by the presiding Judge is this, that the fact that at the sale, the terms were such as are claimed by the complainant, although he claims in his bill to have purchased upon those terms, will not, of itself, authorize the written contract, executed some eighteen or twenty days thereafter, to be reformed; but to justify the reform, it must be proven that the term or condition claimed to be omitted, was a part of the agreement made between the parties at the time the contract was reduced to writing, and was omitted in the writing, *at the time of its date,* by accident, mistake or inadvertence. This distinction is embraced, it is true, in that portion of the instruction copied in the Reporter's brief, and which I have copied above, but is elsewhere expressly made by the presiding Judge. It is the distinction which controls the question. Here is a contract, evidenced in writing, bearing date on the 29th day of December, 1837. The written evidence is the notes of the complainant for the purchase money—one-fourth payable on the 1st March, 1838, one-fourth on the 1st March, 1839, and the other half when the first steam car should run through from Montgomery to West Point—and the bond of the defendants to make titles to the complainant when the last payment of the purchase money is made. This is what is exhibited

as the contract between these parties, reduced to writing on the 29th December, 1837. It is charged in the bill, that in addition to what these writings exhibit, it was then and there agreed, that if the Montgomery Road was not completed to West Point by a stipulated time, the defendants would refund to the complainant the purchase money which he might at that time have paid; that is, that it was then and there agreed, that the plaintiff should have his lots upon the terms of the sale at auction on the 11th day of December, preceding; one of which terms was, that the purchase money should be so refunded. The complainant did prove that such was one of the terms of the public sale, *but he did not prove the vital fact, that he bought on the 28th December, (as he states in his bill,) upon the terms of the public sale on the 11th of December.* It was argued that this was proven inferentially, by proof that this was a condition of the sale in public, so announced by the defendants; that others bought in private upon such terms and some other like circumstances. But all that will not do. The defendants might have sold to others upon this condition at the public sale, or in private, but here is the complainant's contract, in writing, which contains no such condition. The writing is *his* contract—by that he is estopped—he has submitted himself to be bound by it; and the Court is legally bound to hold it as really and truthfully *his* contract, unless he does show, by proof, that it was really and truthfully different in this; that it was agreed that if the road was not completed to West Point by a time certain, the purchase money should be refunded, and that that condition was omitted to be inserted in the writings, by accident, fraud, inadvertence or mistake. Clearly the contract in writing is one contract, and the contract at the public sale is another contract.

[2.] Equity will enforce a contract as the parties made it, although it be reduced to writing, if, by reason of accident, fraud, mistake, or even inadvertence, the writing does not exhibit it really and truly as the parties made it. But Equity will not make a contract for the parties, or allow them to set up a contract in anywise different from that which they have made. And it is a clear rule of evidence, that when a contract is reduced to writ-

ing, the writing is the highest evidence of it, and is, in general, absolutely controlling, yet not universally; for Equity holds control over the writing, so as to relieve against accident, fraud or mistake. The conditions precedent to Equity's interfering with a written contract are, that it be made to appear that the contract was different from what the writing exhibits it, and that it does not truthfully appear by reason of accident, fraud or mistake. If such guards were not thrown around the power of Chancery to interfere with written contracts, the whole benefits of the Statute of Frauds, requiring contracts for the sale of lands to be in writing, and of the rule, generally, that the writing indicates the mind and intent of the parties, and is the best evidence, would be lost. The case, then, which this record presents, is an attempt, not to reform a contract, but to set up a different contract. The ruling of the Court is in accordance with these views, and according to authority. This doctrine as to the power of a Court of Chancery to reform contracts, having been several times before this Court, and maturely considered, it would be perfectly useless labor to review the authorities in relation to it. Among other things we have held, that this jurisdiction will be exercised very sparingly, and with great caution, and only upon the clearest proof of the intention of the parties, and of the mistake or accident upon which it is invoked. *Rogers vs. Atkinson*, 1 *Kelly*, 12. *Trout vs. Goodman*, 7 *Ga. Rep.* 383.

[3.] Independent of this ground, it is asked in the complainant's bill, that the contract be rescinded, on the ground of fraudulent representations made by the defendants at the sale, and the Court below and the counsel for the plaintiff in error, are at issue as to the law which governs that matter. The Court instructed the Jury, that "If they believed that the plaintiff was induced to make the contract by false or fraudulent misrepresentations, or concealment of truth, whether made honestly or dishonestly, with or without knowledge, intentionally or innocently, (inasmuch as fraud vitiates all contracts,) if the complainant was really imposed upon by artifice or misplaced confidence, the contract ought to be set aside." The position of the plaintiff in

error is, that if false representations were made, the contract will be set aside, whether he relied upon them or not, and even when the parties met to treat about the purchase, upon equal terms. To set aside a contract on this ground, the buyer must be misled or deceived by the false representations of the seller, in fact, acting upon them; and if the parties come together to contract under unequal terms—under circumstances which show that the buyer reposes confidence in the seller, and there is fraudulent representation or concealment, the inequality in the position of the parties will be sufficient proof that the confidence is reposed. If the representations are false, and the party making them knows them to be so, and the other party trusts to the statements, and acts upon them, it is a positive fraud.

[4.] This fraud may be perpetrated by acts and artifices designed to mislead, as well as by words.

[5.] And it is, farther, immaterial that the party making the representations is ignorant whether they be true or false; for the affirmation of what one does not know to be true, or believe to be true, is equally, in morals and in law, as unjustifiable as the affirmation of what is known to be positively false.

[6.] In case, however, the representations are believed to be true by him who makes them, it is not, then, a fraud in fact, but is, nevertheless, a fraud in law.

[7.] So, if a party innocently or by mistake misrepresent a fact which is material, and to which the other party trusts, it is good cause to rescind the contract, because it operates as a surprise. In all these cases, the party seeking to set aside the contract, must trust to the representations, and act upon them; and if the parties come together to treat upon unequal terms, it will be presumed that the person injured trusted to and acted upon the representations. There are cases, however, where false representations will not rescind the contract. They are cases where the parties are upon equal terms, and where it is manifest, from all the circumstances, that the buyer does not act upon the opinions or representations of the seller, but upon his own judgment. These positions are very important, and would require at my hands, in this case, careful and extended discussion, but

for the fact that they have received the best consideration of this Court in the case of *Smith & Shorter vs. Mitchell*, 6 *Ga. Rep.* 458. According to the principles stated, the Court was right, and these are all the points relied upon.

Let the judgment be affirmed.